JDG:DAS/PT/AAS
F.#2012R01872

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

JOHN SAMPSON,

          Defendant.

- - - - - - - - - - - - - - -X

**I N D I C T M E N T**

Cr. No.

(T. 18, U.S.C.,
§§ 666(a)(1)(A),
981(a)(1)(C), 1001(a)(2),
1503(a), 1503(b)(3),
1512(b)(2)(A),
1512(b)(2)(B),
1512(b)(2)(C),
1512(b)(3), 1512(c)(1),
1519, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

     At all times relevant to this Indictment, unless otherwise indicated:

I.   <u>The Defendant</u>

     1.   From 1997 through the present, the defendant JOHN SAMPSON was a member of the New York State Senate (the "Senate") representing the 19th Senate District in southeastern Brooklyn. From June 2009 to December 2012, SAMPSON was the leader of the Democratic Conference of the Senate.  From January 2011 to December 2012, SAMPSON was also the Minority Leader of the Senate.

     2.   Since 1992, the defendant JOHN SAMPSON was an attorney licensed to practice law in the State of New York.  His

law practice included, among other things, criminal defense work and legal work involving the sale of foreclosed properties.

3.   In September 2005, the defendant JOHN SAMPSON participated as a candidate in the Democratic Party primary election for the position of Kings County District Attorney. SAMPSON lost this primary election.

II.   Overview of JOHN SAMPSON's Criminal Schemes

4.   Since the 1990's, the defendant JOHN SAMPSON served as a court-appointed referee for foreclosure proceedings conducted by the Kings County Supreme Court.  In that capacity, SAMPSON, acting on behalf of the Kings County Supreme Court, controlled escrow accounts holding proceeds of foreclosure sales of Brooklyn real estate properties.

5.   Since approximately 1998, the defendant JOHN SAMPSON embezzled approximately $440,000 in funds from escrow accounts relating to foreclosure proceedings involving four Brooklyn real estate properties.

6.   On or about July 21, 2006, the defendant JOHN SAMPSON asked an associate (the "Associate"), an individual involved in the real estate business whose identity is known to the Grand Jury, for $188,500.  The Associate agreed and, at SAMPSON's direction, provided SAMPSON with these funds (the "Associate Transaction") in the form of three bank checks payable to third parties.  SAMPSON asked for this $188,500 because he

feared that his embezzlement of funds from foreclosure sales, which he told the Associate he had used to pay expenses arising from his campaign for Kings County District Attorney in 2005, could subject him to criminal prosecution.  SAMPSON therefore sought the funds from the Associate Transaction to repay the embezzled funds before the embezzlement was uncovered.

7.   The defendant JOHN SAMPSON characterized the Associate Transaction as a loan that he would repay.  However, SAMPSON accepted this "loan" without written documentation of the transaction or a contemplated rate of interest.  SAMPSON never repaid these funds to the Associate.  Further, SAMPSON did not divulge the Associate Transaction in his Senate financial disclosure forms, as required.

8.   In July 2011, law enforcement authorities arrested the Associate on bank and wire fraud charges as part of a scheme to defraud mortgage lenders (the "Mortgage Fraud Case").  These charges were filed by the United States Attorney's Office for the Eastern District of New York (the "USAO").

9.   Shortly after the Associate was arrested, the defendant JOHN SAMPSON began engaging in a scheme to obstruct justice, so as to prevent the Associate from cooperating with law enforcement authorities, and thereby prevent authorities from learning of SAMPSON's criminal conduct.  SAMPSON engaged in multiple instances of obstructive conduct, including

(1) attempting to obtain confidential, nonpublic information regarding the Mortgage Fraud Case through a person who, at the time, was an administrative employee in the USAO; and

(2) directing the Associate to withhold documentation of the Associate Transaction from the government.

III. Kings County Foreclosure Proceedings

10. Foreclosure proceedings for real property located in Kings County were administered by the Kings County Supreme Court. Justices of the Kings County Supreme Court appointed local attorneys to act as referees for foreclosure proceedings. A referee was entrusted with conducting the foreclosure sale of a property, and using the proceeds to repay any outstanding mortgages on the property. If a foreclosure sale generated a surplus after repayment of these mortgages and other expenses, the referee was required to tender this surplus to the Kings County Clerk's Office unless otherwise directed by the Kings County Supreme Court. Once the surplus funds were deposited with the Kings County Clerk, the prior owners of the property, and any other interested parties, had the right to receive these funds. The referee owed a fiduciary duty to the Kings County Supreme Court and was prohibited by law from enriching himself at the expense of the Kings County Supreme Court.

11. In or about and between 2007 and 2009, the Kings County Supreme Court was a component of the New York State

Unified Court System, which received in excess of $10,000 in federal grants each year.

IV.   The Embezzlement Scheme

        12.   Beginning in the 1990s, the defendant JOHN SAMPSON served as a court-appointed referee for foreclosure proceedings conducted by the Kings County Supreme Court.  In that capacity, SAMPSON held surplus proceeds of foreclosure sales in escrow accounts (or "surplus funds"), from which he would receive and disburse the funds on behalf of the Kings County Supreme Court (the "Referee Accounts").

        13.   The defendant JOHN SAMPSON breached his fiduciary obligations as referee by embezzling approximately $440,000 in surplus funds from the Referee Accounts he oversaw, involving at least four Brooklyn properties (the "Brooklyn Properties").  The Brooklyn Properties were located at 165 Forbell Street (the "Forbell Street Property"), 1915 Eighth Avenue (the "Eighth Avenue Property"), 831 Linden Boulevard (the "Linden Boulevard Property") and 224 Bay Ridge Avenue (the "Bay Ridge Avenue Property").

        14.   In particular, the defendant JOHN SAMPSON breached his fiduciary obligations as referee by (1) embezzling approximately $80,000 of surplus funds from the Referee Account for the Forbell Street Property; (2) embezzling approximately $80,000 of surplus funds from the Referee Account for the Eighth

Avenue Property; (3) embezzling approximately $145,000 of surplus funds from the Referee Account for the Bay Ridge Avenue Property; and (4) embezzling approximately $135,000 of surplus funds from the Referee Account for the Linden Boulevard Property.

15. The defendant JOHN SAMPSON used $161,000 from the Associate Transaction to pay the Kings County Clerk and others designated by the Kings County Supreme Court a portion of the surplus funds SAMPSON had embezzled from the Referee Accounts for the Bay Ridge Avenue Property and the Linden Boulevard Property. However, SAMPSON never repaid any of the surplus funds he had embezzled from the Referee Accounts for the Forbell Street Property and the Eighth Avenue Property.

A.    The Forbell Street Embezzlement

16. On February 17, 1998, a Justice of the Kings County Supreme Court appointed the defendant JOHN SAMPSON referee for the foreclosure proceeding for the Forbell Street Property. Pursuant to this appointment, SAMPSON was required by law to: (1) deposit the proceeds from the sale of the Forbell Street Property into a Referee Account (the "Forbell Street Referee Account"); (2) satisfy the mortgage and any other outstanding expenses related to the Forbell Street Property; and (3) promptly deposit with the Kings County Clerk any surplus funds from the foreclosure sale.

17.   On October 7, 1998, the defendant JOHN SAMPSON signed a document entitled "Referee's Report of Sale" for the Forbell Street Property.   In this report, SAMPSON represented to the Kings County Supreme Court that: (1) on or about February 17, 1998, SAMPSON sold the Forbell Street Property for $115,000; and (2) there were surplus funds of approximately $80,000 (the "Forbell Street Surplus") resulting from the sale, after repayment of the mortgage and expenses.

18.   The defendant JOHN SAMPSON breached his fiduciary obligations as referee and never deposited any of the Forbell Street Surplus with the Kings County Clerk.   Instead, between July 1998 and June 2008, SAMPSON embezzled approximately $80,000 of the Forbell Street Surplus through cash withdrawals and electronic transfers from the Forbell Street Referee Account. For example, on or about February 13, 2008, SAMPSON transferred $8,000 from the Forbell Street Referee Account into SAMPSON's personal bank account (the "Sampson Account").   SAMPSON never paid the Kings County Clerk any of the funds he embezzled from the Forbell Street Surplus.

B.   The Eighth Avenue Embezzlement

19.   On December 20, 2001, a Justice of the Kings County Supreme Court appointed the defendant JOHN SAMPSON referee for the foreclosure proceeding for the Eighth Avenue Property. Pursuant to this appointment, SAMPSON was required by law to:

(1) deposit the proceeds from the sale of the Eighth Avenue Property into a Referee Account (the "Eighth Avenue Referee Account"); (2) satisfy the mortgage and any other outstanding expenses related to the Eighth Avenue Property; and (3) promptly deposit with the Kings County Clerk any surplus funds from the foreclosure sale of the Eighth Avenue Property.

20.   On June 28, 2002, the defendant JOHN SAMPSON signed a document entitled the "Referee's Report of Sale" for the Eighth Avenue Property.  In this report, SAMPSON represented to the Kings County Supreme Court that: (1) on May 17, 2002, SAMPSON sold the 8th Avenue Property for $180,000; and (2) there were surplus funds of approximately $80,000 (the "Eighth Avenue Surplus") resulting from the sale, after repayment of the mortgage and expenses.

21.   The defendant JOHN SAMPSON, however, did not deposit the Eighth Avenue Surplus with the Kings County Clerk. Instead, starting in approximately 2002, SAMPSON began to embezzle funds from the Eighth Avenue Referee Account.

22.   As a result of the defendant JOHN SAMPSON's embezzlement, on or about July 21, 2006, a balance of $55,167.94 remained in the Eighth Avenue Referee Account.  On or about July 21, 2006, SAMPSON received the Associate Transaction in the form of three bank checks totaling $188,500, one of which was in the amount of $27,500.  SAMPSON combined this $27,500 check with

the $55,167.94 remaining in the Eighth Avenue Referee Account to purchase a bank check in the amount of $82,667.94 (the "2006 Bank Check"). The 2006 Bank Check was made payable to the "Kings County Clerk Office," ostensibly to repay surplus funds embezzled from the Eighth Avenue Referee Account to the Kings County Clerk.

23. However, the defendant JOHN SAMPSON never deposited the 2006 Bank Check with the Kings County Clerk. Instead, nearly two years later, on or about June 7, 2008, SAMPSON exchanged the 2006 Bank Check for eight bank checks worth $10,000 each and one bank check for $2,667.94 (collectively, the "2008 Bank Checks"). Each of the 2008 Bank Checks was made payable to "John Sampson," and the remitter was listed as "John Sampson."

24. On or about and between June 12, 2008 and January 12, 2009, the defendant JOHN SAMPSON redeemed for cash two of the $10,000 bank checks, negotiated the $2,667.94 bank check and deposited three of the $10,000 bank checks into the Sampson Account. The remaining three 2008 Bank Checks, each with a value of $10,000, were not negotiated. SAMPSON never paid the Kings County Clerk the funds he embezzled from the Eighth Avenue Referee Account.

V.   <u>JOHN SAMPSON's Obstruction of Justice</u>

25.   Shortly after the Associate's arrest in the Mortgage Fraud Case in July 2011, the defendant JOHN SAMPSON began engaging in a multifaceted scheme to obstruct justice.

26.   From mid-December 2011 through mid-March 2012, law enforcement authorities conducted a judicially-authorized wiretap of the defendant JOHN SAMPSON's cellular telephone (the "Sampson Wiretap").

A.   JOHN SAMPSON's Use of a USAO Employee to Obstruct
     <u>Justice</u>

27.   Soon after the Associate's arrest, the defendant JOHN SAMPSON informed the Associate that SAMPSON knew an individual who, at that time, was an administrative employee in the USAO (the "Employee"), an individual whose identity is known to the Grand Jury.   SAMPSON told the Associate that the Employee could provide information that would assist the Associate's defense in the Mortgage Fraud Case.

28.   The defendant JOHN SAMPSON took numerous steps to obtain from the Employee confidential, nonpublic information regarding USAO matters.   Specifically, SAMPSON asked the Employee to determine whether the USAO was conducting a criminal investigation of SAMPSON.   In addition, SAMPSON told the Associate that he was attempting to determine the identities of cooperating witnesses in the Mortgage Fraud Case (the "Mortgage Fraud Cooperators").   During one meeting, SAMPSON told the

Associate that, if SAMPSON and the Associate were able to identify the Mortgage Fraud Cooperators, SAMPSON could arrange to "take them out."

29.   When meeting with the defendant JOHN SAMPSON, the Associate asked about SAMPSON's additional efforts to obtain information concerning the Mortgage Fraud Case through the Employee.   SAMPSON, however, was reluctant to discuss over the telephone the Employee's illegal efforts to obtain nonpublic information concerning the Mortgage Fraud Case.   For example, while meeting with the Associate on November 22, 2011, SAMPSON stated, "I can't talk on the phone . . . . From now on, our conversation is, 'I don't have no contacts, you don't know nothing.'   When we talk, that's how we talk."

30.   In April 2012, law enforcement authorities confronted the Employee concerning the Employee's contacts with the defendant JOHN SAMPSON.   Immediately thereafter, agents searched the Employee's office and located a slip of paper which contained the handwritten names of several individuals who were defendants in proceedings related to the Mortgage Fraud Case. The Employee was then suspended and subsequently terminated from his employment at the USAO.

   B.   <u>JOHN SAMPSON's Witness Tampering and Evidence Tampering</u>

31.   On February 22, 2012, the defendant JOHN SAMPSON met with the Associate at a restaurant in Queens, New York.

Acting at the direction of law enforcement, the Associate told SAMPSON that the federal government had subpoenaed the Associate for business records.  The Associate also told SAMPSON that, while reviewing the Associate's records, the Associate had located a check register page which memorialized SAMPSON's receipt of the funds from the Associate Transaction (the "Check Register Page").  The Associate stated that the Associate wanted to show the Check Register Page to SAMPSON before disclosing it to the government.  The Associate then handed the Check Register Page to SAMPSON.  After examining the Check Register Page, SAMPSON stated, "That's a problem . . . I mean for me."

32.  The defendant JOHN SAMPSON instructed the Associate not to disclose the Check Register Page to the government.  When the Associate stated that it might be a problem to withhold the document from the government, SAMPSON told the Associate to claim that the Associate did not maintain all of the Associate's records.  SAMPSON instructed, "Don't say you don't have it.  Just say you don't know.  I don't want you to lie, just say you don't know."  SAMPSON reiterated several times that he did not want the Associate to lie, while repeatedly instructing the Associate to tell the government, "I don't have it."

33.  The defendant JOHN SAMPSON also told the Associate to remove other items from any documents the Associate provided to the government, to make it appear as though the Associate's

records were incomplete.  In addition, SAMPSON suggested that the
Associate could falsely claim that the funds from the Associate
Transaction were payment for legal work SAMPSON performed.

34.  Later during this conversation, the defendant JOHN
SAMPSON instructed the Associate that, if the government asked
the Associate whether the Associate ever loaned SAMPSON money,
the Associate should say "No."  SAMPSON also suggested that,
alternatively, the Associate could falsely claim that the
Associate "forgave" any loan to SAMPSON.

35.  The defendant JOHN SAMPSON retained the Check
Register Page during and after this meeting, and never returned
it to the Associate.

36.  On the evening of February 22, 2012, after the
meeting described above, the defendant JOHN SAMPSON called the
Associate on the telephone.  This conversation was captured on
the Sampson Wiretap.  During the call, SAMPSON asked if the
Associate was making "copies of everything."  The Associate
responded that the Associate had brought the original Check
Register Page to SAMPSON and had not kept any copies.

VI.   The Interview of JOHN SAMPSON

37.  On July 27, 2012, Special Agents from the Federal
Bureau of Investigation (the "FBI") approached the defendant JOHN
SAMPSON outside his Brooklyn residence and asked him about his
involvement in, among other things, the criminal schemes

described above.  During the interview, SAMPSON made the
following statements in sum and substance, and in part.

38.  When shown a copy of the Check Register Page, the
defendant JOHN SAMPSON stated that the document "didn't ring a
bell" and that he "didn't have a recollection from it."  SAMPSON
also stated that he did not recall seeing the Check Register Page
previously.

39.  The defendant JOHN SAMPSON admitted that he had
asked the Employee for information on the Mortgage Fraud Case,
but claimed that he only requested public information from the
Employee, such as the name of the judge assigned to the Mortgage
Fraud Case.  When asked why he would request public information
from an employee of the USAO, when SAMPSON himself was an
attorney, SAMPSON stated that he was not "good" with computers.

40.  At the conclusion of the interview, the agents
advised the defendant JOHN SAMPSON that he had lied to federal
agents, which constituted a federal crime.  After being asked
whether he wished to revise his statement, SAMPSON stated, "Not
everything I told you was false."

## COUNT ONE
(Embezzlement - Forbell Street)

41.  The allegations in paragraphs one through forty
are realleged and incorporated as if fully set forth in this
paragraph.

42.   On or about February 13, 2008, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON, an agent of the Kings County Supreme Court, a component of the New York State Unified Court System, did knowingly and intentionally embezzle, steal, obtain by fraud, misapply and otherwise without authority knowingly convert to the use of a person other than the rightful owner, property of the Kings County Supreme Court, a component of the New York State Unified Court System, an agency of state government that received benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance in one or more one-year periods, which property was valued at $5,000 or more, and was owned by, and was under the care, custody and control of, the Kings County Supreme Court, to wit: $8,000 of the Forbell Street Surplus.

(Title 18, United States Code, Sections 666(a)(1)(A) and 3551 <u>et seq.</u>)

<div align="center">

COUNT TWO
(Embezzlement - Eighth Avenue)
</div>

43.   The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

44.   On or about June 7, 2008, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON,

an agent of the Kings County Supreme Court, a component of the
New York State Unified Court System, did knowingly and
intentionally embezzle, steal, obtain by fraud, misapply and
otherwise without authority knowingly convert to the use of a
person other than the rightful owner, property of the Kings
County Supreme Court, a component of the New York State Unified
Court System, an agency of state government that received
benefits in excess of $10,000 under one or more Federal programs
involving grants, contracts, subsidies, loans, guarantees,
insurance and other forms of Federal assistance in one or more
one-year periods, which property was valued at $5,000 or more,
and was owned by, and was under the care, custody and control of,
the Kings County Supreme Court, to wit: $82,667.94 of the Eighth
Avenue Surplus.

(Title 18, United States Code, Sections 666(a)(1)(A)
and 3551 et seq.)

<div align="center">COUNT THREE
(Obstruction of Justice - Mortgage Fraud Case)</div>

45.   The allegations in paragraphs one through forty
are realleged and incorporated as if fully set forth in this
paragraph.

46.   In or about and between July 2011 and July 2012,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant JOHN SAMPSON,
together with others, did knowingly, intentionally and corruptly

endeavor to influence, obstruct and impede the due administration of justice in an official proceeding, to wit: the Mortgage Fraud Case.

(Title 18, United States Code, Sections 1503(a), 1503(b)(3), 2 and 3551 et seq.)

<u>COUNT FOUR</u>
(Witness Tampering - Check Register Page)

47.   The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

48.   On or about February 22, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly persuade and attempt to persuade the Associate, with intent: (a) to cause and induce the Associate to (1) withhold the Check Register Page, (2) conceal the Check Register Page with intent to impair its availability for use, and (3) evade legal process summoning the Associate to produce the Check Register Page, all in connection with one or more official proceedings, to wit: (i) a grand jury investigation in the Eastern District of New York, and (ii) the Mortgage Fraud Case; and (b) to hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the FBI and prosecutors in the USAO, of information, specifically, the Check Register Page, relating to

the commission and possible commission of one or more Federal offenses, to wit: (1) federal program embezzlement, in violation of Title 18, United States Code, Section 666(a)(1)(A), as described in paragraphs five, six and twelve through twenty-four, and as charged in Counts One and Two above, and (2) federal program bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B), in connection with the Associate Transaction as described in paragraphs six and seven.

(Title 18, United States Code, Sections 1512(b)(2)(A), 1512(b)(2)(B), 1512(b)(2)(C), 1512(b)(3) and 3551 et seq.)

## COUNT FIVE
### (Witness Tampering - Associate Transaction)

49. The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

50. On or about February 22, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly persuade and attempt to persuade the Associate, with intent to hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the FBI and prosecutors in the USAO, of information, to wit: information regarding the Associate Transaction, relating to the commission and possible commission of one or more Federal offenses, to wit: (a) federal program embezzlement, in violation of Title 18, United States

Code, Section 666(a)(1)(A), as described in paragraphs five, six and twelve through twenty-four, and as charged in Counts One and Two above, and (b) federal program bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B), in connection with the Associate Transaction as described in paragraphs six and seven.

(Title 18, United States Code, Sections 1512(b)(3) and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT SIX</u>
(Tampering with Evidence)

51.  The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

52.  In or about and between February 2012 and August 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly conceal and attempt to conceal a record, document and other object, to wit: the Check Register Page, with the intent to impair the availability of the Check Register Page for use in one or more official proceedings, to wit: (a) a grand jury investigation in the Eastern District of New York, and (b) the Mortgage Fraud Case.

(Title 18, United States Code, Sections 1512(c)(1) and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT SEVEN</u>
(Concealment of Records)

53.   The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

54.   In or about and between February 2012 and August 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON did knowingly and intentionally conceal and cover up a record, document and tangible object, to wit: the Check Register Page, with the intent to impede, obstruct and influence a matter within the jurisdiction of a department and agency of the United States, to wit: the United States Department of Justice, and in relation to and in contemplation of such matter.

(Title 18, United States Code, Sections 1519 and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT EIGHT</u>
(False Statement - Check Register Page)

55.   The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

56.   On or about July 27, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, in a matter within the jurisdiction

of the executive branch of the Government of the United States, to wit: the FBI, in that the defendant falsely stated and represented to FBI Special Agents that he did not recall seeing the Check Register Page previously, when in fact, as he then and there well knew and believed, the defendant did recall seeing the Check Register Page previously.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

COUNT NINE
(False Statement - Request For Nonpublic Information)

57. The allegations in paragraphs one through forty are realleged and incorporated as if fully set forth in this paragraph.

58. On or about July 27, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the FBI, in that the defendant falsely stated and represented to FBI Special Agents that he only requested public information from the Employee, when in fact, as he then and there well knew and believed, the defendant requested nonpublic information from the Employee.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION FOR COUNTS ONE AND TWO

59. The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged in Counts One and Two of this Indictment, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), which requires the forfeiture of all property, real or personal, that constitutes or is derived from proceeds traceable to any such offenses.

60. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

23

other property of the defendant up to the value of the

forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C);

Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#2012R01872

No._____

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL *Division*

## THE UNITED STATES OF AMERICA

*vs.*

*John Sampson,*

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 666(a)(1)(A), 981(a)(1)(C), 1001(a)(2), 1503(a), 1503(b), 1512(b)(2)(A), 1512(b)(2)(B), 1512(b)(2)(C), 1512(b)(3), 1512(c)(1), 1519, 2 and 3551 et seq.; T. 21, U.S.C. § 853(p))

*A true bill.*

_____
Foreman

Filed in open court this _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ day,

of _ _ _ _ _ _ _ _ _ _ A.D. 20 _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Clerk

Bail, $ _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Assistant U.S. Attorneys Paul Tuchmann (718-254-6294), Daniel Spector (718-254-6345) and Alexander Solomon (718-254-6074)*