UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,


                - against -                    Index No. 1:13-CR-00269

JOHN SAMPSON,

              Defendant.


------------------------------------------------------X




**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
JOHN SAMPSON'S PRETRIAL MOTION TO DISMISS AND TO SEVER**




Nathaniel Akerman, Esq.
Joshua Colangelo-Bryan, Esq.
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
(212) 415-9217

*Attorneys for Defendant
John Sampson*

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................1

II. RELEVANT FACTS ............................................................................4

  A. COUNTS 1 AND 2 CHARGE EMBEZZLEMENT ................................4

    1. New York State Law Required Foreclosure Referees to Transfer to the Court Any Surplus Funds Within Five Days of Receipt......................4

    2. The Alleged Forbell Street Property Embezzlement (Count 1)..................4

    3. The Alleged Eighth Avenue Property Embezzlement (Count 2)................6

  B. COUNTS 3 – 9 CHARGE OBSTRUCTION OF JUSTICE AND RELATED FALSE STATEMENTS .........................................................7

  C. COUNT 10 CHARGES A FALSE STATEMENT ARISING OUT OF THE "LIQUOR STORE SCHEME" ....................................................8

III. ARGUMENT ....................................................................................9

  A. COUNTS 1 AND 2 SHOULD BE DISMISSED AS TIME-BARRED ................9

    1. The Statute of Limitations for 18 U.S.C. § 666 Is Five Years..................10

    2. The Embezzlements Were Completed Outside the Statute of Limitations .................................................................................10

    3. The SSI's Allegations Regarding Post-Embezzlement Activity Do Not Render this Prosecution Timely........................................15

  B. COUNTS 1 AND 2 SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION ....................................................19

  C. COUNT 10, PREDICATED UPON THE LIQUOR STORE SCHEME, WAS IMPROPERLY JOINED AND SHOULD BE SEVERED .................................21

    1. Two or More Related Offenses May Be Joined for Trial Absent a Danger of Unfair Prejudice .................................................22

    2. The Embezzlement and Obstruction Counts Have No Relation to Sampson's Alleged Statement About the Liquor Store ............................24

    3. Joinder Should Not Be Permitted Solely Because the Allegedly False Statements Alleged in Counts 8-10 Were Made During a Single Interview .................................................................................26

4.      Even if Count 10 Had Been Properly Joined, Proof of that Count Will
        Create Unfair Prejudice..............................................................................28

CONCLUSION....................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brogan v. U.S.*,
522 U.S. 398 (1998)........................................................................................27, 28

*Gordy Co. v. Mary Jane Girls, Inc.*,
Nos. 86 CIV. 6814 (RWS), 1989 WL 28477 (S.D.N.Y. Mar. 24, 1989) ..............29

*Moore v U.S.*,
160 U.S. 268 (1895)..............................................................................................11

*N.Y. v. Antilla*,
77 N.Y.2d 853 (1991) ...........................................................................................17

*Pendergast v. U.S.*,
317 U.S. 412 (1943)..............................................................................................10

*Steinberg v. Zebrasky*,
No. 10 Civ. 4372 (RJS), 2011 WL 2565498 (S.D.N.Y. June 14, 2011)................17

*Stogner v. California*,
539 U.S. 607 (2003)................................................................................................9

*Toussie v. U.S.*,
397 U.S. 112 (1970)................................................................................9, 10, 13, 14

*U.S. v. Beard*,
713 F. Supp. 285 (S.D. Ind. 1989) .......................................................................18

*U.S. v. Bezmalinovic*,
No. S3 96 Cr. 97, 1996 WL 737037 (S.D.N.Y. Dec. 26, 1996) ...........................25

*U.S. v. Birney*,
686 F.2d 102 (2d Cir. 1982)....................................................................................9

*U.S. v. Buchanan*,
930 F. Supp. 657 (D. Mass. 1996) .......................................................................25

*U.S. v. Diogo*,
320 F.2d 898 (2d Cir. 1963)..................................................................................27

*U.S. v. Donehue*,
No. C 07-00380 SI, 2008 WL 1900992 (N.D. Cal. April 28, 2008) ......................10

*U.S. v. Dransfield,*
   913 F. Supp. 702 (E.D.N.Y. 1996) .......................................................................19

*U.S. v. Gonzalez,*
   No. 06 Cr. 726 (WHP), 2008 WL 3914877 (S.D.N.Y. Aug. 26, 2008) ................................10

*U.S. v. Halper,*
   590 F.2d 422 (2d Cir. 1979)................................................................ *passim*

*U.S. v. Harris,*
   No. 5:07crl-DCB-LCA, 2007 WL 2028948 (S.D. Miss. July 11, 2007) ................................19

*U.S. v. Irvine,*
   98 U.S. 450 (1878)................................................................................11, 12, 16

*U.S. v. Jackson,*
   313 F.3d 231 (5th Cir. 2002) ..............................................................................19

*U.S. v. Jones,*
   16 F.3d 487 (2d Cir. 1994)................................................................................32

*U.S. v. Jones,*
   676 F. Supp. 2d 500 (W.D. Tex. 2009)....................................................................10

*U.S. v. Kerik,*
   615 F. Supp. 2d 256 (S.D.N.Y. 2009) ..............................................................9, 25

*U.S. v. Langston,*
   590 F.3d 1226 (11th Cir. 2010) ........................................................................ 20-21

*U.S. v. Lekhtman,*
   No. 08-CR-508 (DLI), 2009 WL 5095379 (E.D.N.Y. Dec. 15, 2009) ................................31

*U.S. v. Levine,*
   658 F.2d 113 (3d Cir. 1981)................................................................................9

*U.S. v. Marion,*
   404 U.S. 307 (1971) ........................................................................................9

*U.S. v. McCarthy,*
   271 F.3d 387 (2d Cir. 2001)................................................................16, 17, 18

*U.S. v. Moore,*
   612 F.3d 698 (D.C. Cir. 2010) ..........................................................................28

*U.S. v. Podde,*
   105 F.3d 813 (2d Cir. 1997)................................................................................9

*U.S. v. Sampson*,
  385 F.3d 183 (2d Cir 2004)............................................................................26

*U.S. v. Shellef*,
  507 F.3d 82 (2d. Cir 2007)............................................................................25

*U.S. v. Silverman*,
  430 F.2d 106 (2d Cir. 1970)....................................................................11, 13

*U.S. v. Stewart*,
  433 F.3d 273 (2d Cir. 2006).........................................................................25

*U.S. v. Stockton*,
  788 F.2d 210 (4th Cir. 1986) ...................................................................11, 15

*U.S. v. Sunia*,
  643 F. Supp. 2d 51 (D.D.C. 2009) ......................................................10, 12, 21

*U.S. v. Urlacher*,
  784 F. Supp. 61 (W.D.N.Y. 1992), *aff'd U.S. v. Urlacher,* 979 F.2d 935 (2d
  Cir. 1992) ..................................................................................................21

*U.S. v. Walsh*,
  700 F.2d 846 (2d Cir. 1983)............................................................................9

*U.S. v. Walsh*,
  928 F.2d 7 (1st Cir. 1991) .............................................................................11

*U.S. v. Yashar*,
  166 F.3d 873 (7th Cir. 1999) .........................................................................10

*U.S. v. Yermian*,
  468 U.S. 63 (1984)........................................................................................28

**Statutes**

18 U.S.C. § 666................................................................................. *passim*

18 U.S.C. § 1001 .............................................................................. *passim*

18 U.S.C. § 3282..........................................................................10, 14

New York Real Property Actions and Proceedings Law § 1354(4) ................... *passim*

**Other Authorities**

Fed.R.Crim.P. 8(a) ........................................................................... *passim*

Fed.R.Crim.P. 12 ..................................................................................1

Fed.R.Crim.P. 13 ...................................................................................................................24

Fed.R.Crim.P. 14(a) ....................................................................................... *passim*

Fed.R.Evid. 404(b)........................................................................................25, 26

Fed.R.Evid. 403 advisory committee's note .............................................................28

Weinstein's Federal Evidence § 404.21[3][b] (Volume 2 2014)……………………………28-29

## I.        PRELIMINARY STATEMENT

John Sampson ("Sampson") moves to dismiss Counts 1 and 2 of the Second Superseding Indictment (the "SSI") pursuant to Fed.R.Crim.P. 12 and to sever Count 10 pursuant to Fed.R.Crim.P. 14(a).  By way of context, the initial Indictment in this case was returned on April 29, 2013 (the "Initial Indictment"), charging nine counts.[1]  A Superseding Indictment (the "First Superseding Indictment") was returned on February 3, 2014, which regurgitated the nine counts previously asserted and added one additional unrelated count.  Then, on May 28, 2014, the government secured yet another charging instrument – the SSI – in an attempt to shore up allegations it hopes will establish subject matter jurisdiction as to Counts 1 and 2.

Counts 1 and 2 of the SSI should be dismissed, first, because they allege crimes outside the five-year statute of limitations.  These counts allege that in 2008 Sampson, as a court-appointed referee, embezzled funds from foreclosure proceedings he oversaw involving two properties in Brooklyn, in violation of 18 U.S.C. § 666.  Fatal to both counts is the fact that any embezzlement of these funds occurred years earlier.

As a referee, Sampson was required by New York State statute and court order to deposit any surplus proceeds from the foreclosure sales with the Kings County Supreme Court Clerk within five days of receiving them.  Sampson received the full sale proceeds from the foreclosure sale of the Forbell Street Property (per Count 1) by early October 1998 and deposited them in an account under his sole control.  Sampson received the full sale proceeds from the foreclosure sale of the "Eighth Avenue Property" (per Count 2) by late June 2002 and deposited them in a separate account, also under his sole control.  Thus, the duties to deposit funds with the Kings County Supreme Court were in effect in October 1998 and July 2002, respectively, and

---

[1] On January 28, 2013, Sampson and the government entered into a tolling agreement as to matters in connection with the "Forbell Street Property," the purported basis for Count 1, by which the statute of limitations in relation to those matters was tolled through May 17, 2013.

Sampson's alleged failure to deposit the funds within five days of receipt means the embezzlements occurred at those times.  On this basis, the SSI itself alleges that Sampson committed embezzlements in "July 1998" and "approximately 2002."  Moreover, the SSI alleges that Sampson failed to deposit the surplus funds at any point before 2008, when the government contends the statute of limitations began to run, a period of ten years in relation to the Forbell Street Property and six years in relation to the Eighth Avenue Property.

The SSI not only accuses Sampson of embezzling the funds by failing to deposit them with the court in 1998 and 2002, or in the years that followed, but also of withdrawing them from the bank accounts he controlled at some point by 2006 (for the Eighth Avenue Property account) and in 2007 (for the Forbell Street Property Account), periods also outside the statute of limitations.  Consequently, under any analysis, the five-year statute of limitations had expired by the time Sampson was indicted in 2013.

Dismissal of these counts is not avoided by the SSI's allegations that Sampson engaged in subsequent transactions involving certain of the embezzled funds in 2008, the purported bases for Counts 1 and 2.  The law is clear that embezzlement is not a continuing offense and engaging in transactions with embezzled funds is not a separate crime.

Counts 1 and 2 also should be dismissed for lack of subject matter jurisdiction.  The SSI fails to allege accurately that Sampson was the agent of an entity that received $10,000 in federal funds during the relevant years, a prerequisite for subject matter jurisdiction pursuant to 18 U.S.C. § 666.  Specifically, the SSI alleges that Sampson was an agent of the Supreme Court of the State of New York, which received $10,000 in federal funds between 2007 and 2009. However, as a referee, Sampson was only authorized to act on behalf of the Kings County Supreme Court, and not on behalf of the Supreme Court of the State of New York as a whole.

Critically, the SSI does not and could not allege that the Kings County Supreme Court received the requisite federal funds.

Moreover, for 18 U.S.C. § 666 to apply at all, Sampson would have had to have been an agent of the victim-entity at the time of the embezzlements.  Critically, Sampson was not an agent of the Kings County Supreme Court (or any other arguably relevant entity) at the time of the charged embezzlements in 2008, because the foreclosure proceedings at issue had long been terminated, and with them, Sampson's agency.

Count 10, relating to an alleged "Liquor Store Scheme," should be severed pursuant to Fed.R.Crim.P. 14(a).  Count 10 was improperly joined in a transparent effort by the government to buttress the charges in the Initial Indictment and is predicated on the allegation that Sampson made a false statement to FBI agents about whether he directed his Senate office staff to intercede with state tax authorities on behalf of a liquor store (the "Liquor Store") in which he purportedly had an interest.  In connection with Count 10, the government will attempt to prove, consistent with the SSI's allegations, that Sampson, as a Senator, wrongfully failed to disclose his interest in the Liquor Store, misused his office in an effort to secure benefits for the Liquor Store, and received his interest in the Liquor Store under questionable circumstances, although the government does not charge Sampson with wrongdoing in relation to those alleged acts.  The government also will attempt to prove that Sampson committed an uncharged New York State felony by submitting an inaccurate liquor license application.

Count 10 has no meaningful relationship to any other count.  Moreover, the allegations that Sampson misused his public office – by which the government will attempt to prove the requisite element of materiality – will create a substantial risk that the jury will impute guilt as to the other charges.  Indeed, the government has repeatedly portrayed this as a "political" case,

-3-

even though no count charges the misuse of Sampson's public office.

## II.     RELEVANT FACTS

### A.     COUNTS 1 AND 2 CHARGE EMBEZZLEMENT

#### 1.     New York State Law Required Foreclosure Referees to Transfer to the Court Any Surplus Funds Within Five Days of Receipt

On a number of occasions, Sampson, was appointed to act as a "referee for foreclosure proceedings" of "Brooklyn real estate."  SSI ¶ 12; *see also id.* ¶¶ 4, 14.  As a referee, Sampson was "entrusted by the Supreme Court with conducting the sale of a foreclosed property, and using the proceeds to repay any outstanding mortgages." *Id.* ¶ 12.  If any foreclosure proceeds remained after outstanding obligations were satisfied, Sampson was required to tender that "surplus" to the clerk of the Kings County Supreme Court. *Id.* ¶¶ 12, 18, 21.  The New York Real Property Actions and Proceedings Law ("RPAPL") § 1354(4) required that "[a]ll surplus moneys arising from the [foreclosure] sale shall be paid into court by the officer conducting the sale *within five days* after the same shall be received."  (emphasis added).

#### 2.     The Alleged Forbell Street Property Embezzlement (Count 1)

On February 17, 1998, Sampson was appointed as referee for the foreclosure sale of the Forbell Street Property.  SSI ¶ 18.  As the SSI sets forth, "SAMPSON was required by law to: (1) deposit the proceeds from the sale of the Forbell Street Property into a Referee Account (the 'Forbell Street Referee Account'); (2) satisfy the mortgage and any other outstanding expenses related to the Forbell Street Property; and (3) promptly deposit with the Kings County Clerk any surplus funds…." *Id.*  Specifically, a Judgment of Foreclosure and Sale, produced in discovery by the government, ordered that any surplus be deposited with the court "within five days," the same period delineated by the RPAPL.  Declaration of Nathaniel H. Akerman ("Akerman

Decl.") Ex. A.[2]

The SSI further alleges that:  "On October 7, 1998, [Sampson] signed a document entitled 'Referee's Report of Sale' for the Forbell Street Property," in which he "represented to the Supreme Court that: (1) on or about February 17, 1998, SAMPSON sold the Forbell Street Property for $115,000; and (2) there were surplus funds of approximately $80,000 (the 'Forbell Street Surplus') resulting from the sale…."  SSI ¶ 19.  In fact, the SSI does not accurately cite the Referee's Report of Sale, which provides that the sale occurred on July 9, 1998, not February 17, 1998.  Akerman Decl. Ex. B.

The SSI then alleges that "SAMPSON breached his fiduciary obligations as referee and never deposited any of the Forbell Street Surplus with the Kings County Clerk," thereby embezzling it beginning in "July 1998."  SSI ¶ 20.  The government is mistaken in its reference to July 1998.  Indeed, while no existing document shows conclusively the date on which the full proceeds were received (which would have triggered the five-day period to deposit the surplus, as opposed to the date of sale), public records – produced in discovery by the government – show that by October 7, 1998 the proceeds had been received.  Akerman Decl. Ex. C.

Beyond alleging that Sampson did not deposit the funds with the court near the time of receipt, the SSI alleges that Sampson made "cash withdrawals and electronic transfers from the Forbell Street Referee Account" in the period "between July 1998 and June 2008."   SSI ¶ 20.  Indeed, according to documents produced by the government, by January 9, 2008, a date outside the statute of limitations, Sampson had made thirteen withdrawals from the Forbell Street Referee Account.  Akerman Decl. Ex. D.

The SSI alleges a single act within the limitations period as to the Forbell Street Property:

---

[2] One page of the Judgment of Foreclosure and Sale as produced by the government (JS023436) appears to be missing text at the top; we have been unable to secure a copy of this page on which the missing text appears.

"on or about February 13, 2008, SAMPSON transferred $8,000 from the Forbell Street Referee Account into SAMPSON's personal bank account." SSI ¶ 20; *see also id.* ¶ 54.

### 3.    The Alleged Eighth Avenue Property Embezzlement (Count 2)

On March 18, 2002, Sampson was appointed as referee for the foreclosure sale of the Eighth Avenue Property. SSI ¶ 21. As the SSI alleges, Sampson "was required by law to: (1) deposit the proceeds from the sale of the Eighth Avenue Property into a Referee Account (the 'Eighth Avenue Referee Account'); (2) satisfy the mortgage and any other outstanding expenses related to the Eighth Avenue Property; and (3) promptly deposit with the Kings County Clerk any surplus funds…." *Id.* Consistent with the RPAPL, an Order Confirming the Referee's Report of Amount Due and Judgment of Foreclosure and Sale directed that any surplus be deposited with the court "w/I [sic] 5 days after the same shall be received and be ascertainable, to the credit of this action, to be withdrawn only on the order of the court." Akerman Decl. Ex. E.

The SSI further alleges that: "On June 28, 2002, the defendant JOHN SAMPSON signed a document entitled the 'Referee's Report of Sale' for the Eighth Avenue Property," in which he "represented to the Supreme Court that: (1) on May 17, 2002, SAMPSON sold the Eighth Avenue Property for $180,000; and (2) there were surplus funds of approximately $80,000 (the 'Eighth Avenue Surplus') resulting from the sale…." SSI ¶ 22. According to the SSI, Sampson "did not deposit the Eighth Avenue Surplus with the Kings County Clerk" but "[i]nstead, starting in approximately 2002, [] began to embezzle funds from the Eighth Avenue Referee Account." *Id.* ¶ 23. While the SSI specifies no date in 2002, a deed, dated June 28, 2002, shows that the proceeds had been received by that date, triggering the five-day period in which the surplus had to be deposited. Akerman Decl. Ex. F.

The SSI also alleges that: "As a result of the defendant JOHN SAMPSON's embezzlement, on or about July 21, 2006, a balance of $55,167.94 remained in the Eighth

Avenue Referee Account.   On or about July 21, 2006, SAMPSON received the Associate Transaction in the form of three bank checks totaling $188,500, one of which was in the amount of $27,500.   SAMPSON combined this $27,500 check with the $55,167.94 remaining in the Eighth Avenue Referee Account to purchase a bank check in the amount of $82,667.94 (the '2006 Bank Check').   The 2006 Bank Check was made payable to the 'Kings County Clerk Office,' ostensibly to repay surplus funds embezzled from the Eighth Avenue Referee Account to the Kings County Clerk."   SSI ¶ 24.   The SSI alleges, however, that Sampson "never deposited the 2006 Bank Check with the Kings County Clerk."  *Id.* ¶ 25.

Finally, the SSI makes its only allegations regarding conduct within the limitations period in connection with the Eighth Avenue Property:  "nearly two years later, on or about June 7, 2008, SAMPSON exchanged the 2006 Bank Check for eight bank checks worth $10,000 each and one bank check for $2,667.94 (collectively, the '2008 Bank Checks').   Each of the 2008 Bank Checks was made payable to 'John Sampson,' and the remitter was listed as 'John Sampson.'"  SSI ¶ 25.   The SSI also alleges that:  "On or about and between June 12, 2008 and January 12, 2009, the defendant JOHN SAMPSON redeemed for cash two of the $10,000 bank checks, negotiated the $2,667.94  bank check and deposited three of the $10,000 bank checks into the Sampson Account," and "[t]he remaining three 2008 Bank Checks, each with a value of $10,000, were not negotiated…."  *Id.* ¶ 26.

**B.   COUNTS 3 – 9 CHARGE OBSTRUCTION OF JUSTICE AND RELATED FALSE STATEMENTS**

The SSI alleges "a scheme to obstruct justice, so as to prevent [an] Associate [of Sampson] from cooperating with law enforcement authorities, and thereby prevent authorities from learning of SAMPSON's criminal conduct" relating to the embezzlement.  SSI ¶ 9.  More specifically, Counts 3 through 7 are premised on allegations that Sampson "engaged in multiple

instances of obstructive conduct, including: (1) attempting to obtain confidential, nonpublic information regarding [the prosecution of the Associate]…and (2) directing the Associate to withhold documentation of the Associate Transaction from the government." *Id.*; *see also id.* ¶¶ 57-66. Counts 8 and 9 charge Sampson with making false statements to the FBI in relation to the alleged obstruction of justice. *Id.* ¶¶ 67-70.

## C.   COUNT 10 CHARGES A FALSE STATEMENT ARISING OUT OF THE "LIQUOR STORE SCHEME"

Count 10, the only new charge in the First Superseding Indictment, concerns an alleged "Liquor Store Scheme." In connection with Count 10, the SSI alleges that Sampson and his partners "submitted a liquor license application" that "did not disclose the ownership interests of" Sampson and two other partners. SSI ¶ 42. The SSI emphasizes the felonious import of this purported non-disclosure:

> The sale of alcoholic beverages in the State of New York, including the licensing of retail liquor stores, is regulated by the SLA [State Liquor Authority]….the SLA requires disclosure in a liquor license application of all owners or principals of any retail liquor store. Knowingly submitting a license application to the SLA that contains false statements or information is a felony under New York State Penal Law….

*Id.* ¶ 39; *see also* ¶ 10.

The SSI also alleges that Sampson "repeatedly directed a member of his Senate staff…(the 'Staffer') to intervene with the [New York State Department of Taxation and Finance] on behalf of the Liquor Store in order to resolve the Liquor Store's outstanding sales tax obligations, including by attempting to reduce the amount the Liquor Store owed." SSI ¶ 44. The SSI further alleges, "[a]t the time of his directives to the Staffer, SAMPSON had not revealed his ownership interest in the Liquor Store to the public or to his Senate staff." *Id.*

Notwithstanding these allegations, the only crime charged relating to the Liquor Store Scheme is one count of making a false statement to FBI agents, *i.e.,* that Sampson "falsely stated

and represented…that he did not ask any member of his Senate Staff to assist…in any matter related to the Liquor Store, when in fact…he had asked the Staffer, who was a member of SAMPSON's Senate staff, to assist…in resolving the Liquor Store's outstanding sales tax balance owed…."  SSI ¶ 72; *see also id.* ¶ 51.

## III.   ARGUMENT

## A.   COUNTS 1 AND 2 SHOULD BE DISMISSED AS TIME-BARRED

The Supreme Court has explained the policies underlying statutes of limitations:

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions.  Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

*Toussie v. U.S.,* 397 U.S. 112, 114-15 (1970).  Thus, criminal statutes of limitations "exist[] primarily to protect the rights of the defendant."  *U.S. v. Podde*, 105 F.3d 813, 819 (2d Cir. 1997); *see also U.S. v. Levine*, 658 F.2d 113, 119 (3d Cir. 1981) ("Fairness to defendants would appear to be the primary consideration of statutes of limitations.").

In particular, there is a presumption that a defendant's right to a fair trial would be prejudiced by prosecution after the limitations period has expired.  *Stogner v. California*, 539 U.S. 607, 611 (2003).  Thus, statutes of limitations are "the primary guarantee a citizen possesses against stale or long-delayed charges being made against him."  *U.S. v. Birney*, 686 F.2d 102, 105 (2d Cir. 1982).  For all of these reasons, "criminal statutes of limitation are to be liberally interpreted in favor of repose."  *U.S. v. Marion*, 404 U.S. 307, 322 (1971).[3]

---

[3] Obviously, the Court has authority to dismiss charges filed outside of the limitations period before trial.  *See, e.g., U.S. v. Walsh*, 700 F.2d 846, 856 (2d Cir. 1983).  Pretrial adjudication is particularly appropriate here, given that the government has specified the conduct (occurring in 2008) that it contends satisfies the statute of limitations and there is no dispute regarding the relevant facts.  See *U.S. v. Kerik*, 615 F. Supp. 2d 256, 257 n.14 (S.D.N.Y. 2009).

1.      **The Statute of Limitations for 18 U.S.C. § 666 Is Five Years**

Counts 1 and 2, charging violations of 18 U.S.C. § 666, are governed by a five-year statute of limitations.  *See* 18 U.S.C. § 3282 ("no person shall be prosecuted, tried, or punished for any offense…unless the indictment is found…within five years next after such offense shall have been committed.")  Thus, any prosecution pursuant to 18 U.S.C. § 666 must commence within five years of the time a violation of the statute is completed.  *See e.g., Pendergast v. U.S.,* 317 U.S. 412, 420 (1943).

Moreover, 18 U.S.C. § 666 is not a "continuing offense."  As the Supreme Court explained, in interpreting 18 U.S.C. § 3282, "Congress has declared a policy that the statute of limitations should not be extended '[e]xcept as otherwise expressly provided by law.'"  *Toussie,* 397 U.S. at 115 (citations omitted).  Therefore, an offense is deemed "continuing" only when "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  *Id.*   Based on the plain language of 18 U.S.C. § 666, courts have consistently held that the statute is not a continuing offense.  *See U.S. v. Yashar,* 166 F.3d 873, 876 (7th Cir. 1999); *U.S. v. Gonzalez,* No. 06 Cr. 726 (WHP), 2008 WL 3914877, at *4 (S.D.N.Y. Aug. 26, 2008); *U.S. v. Jones,* 676 F. Supp. 2d 500, 518 (W.D. Tex. 2009) ("Section 666 is not a continuing offense, but rather a completed offense."); *U.S. v. Sunia,* 643 F. Supp. 2d 51, 72-73 (D.D.C. 2009) (same); *U.S. v. Donehue,* No. C 07-00380 SI, 2008 WL 1900992, at *2 (N.D. Cal. April 28, 2008) (same).

2.      **The Embezzlements Were Completed Outside the Statute of Limitations**

The statute of limitations began to run here when the alleged embezzlements were completed.  The elements of embezzlement are:

(1)    a conversion – or, in other words, an unauthorized appropriation – of

-10-

property belonging to another,

(2)   the property is lawfully in the defendant's possession (though for a limited purpose) at the time of the appropriation, and

(3)   the defendant acts with knowledge that his appropriation of the property is unauthorized, or at least without a good-faith belief that it has been authorized.

*U.S. v. Stockton*, 788 F.2d 210, 217 (4th Cir. 1986); *see also Moore v U.S.*, 160 U.S. 268, 269 (1895) ("Embezzlement is the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come."); *U.S. v. Silverman*, 430 F.2d 106, 126-27 (2d Cir. 1970) (Friendly, J. dissenting) (among embezzlement statutes, "the common thread is that the defendant…has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done."); *U.S. v. Walsh*, 928 F.2d 7, 12 (1st Cir. 1991) (citing elements as enunciated in *Stockton*).

It is well established that embezzlement and conversion are completed as soon as a defendant's possession of property becomes wrongful.  In *U.S. v. Irvine*, 98 U.S. 450, 451 (1878), an attorney was charged with withholding funds from a client for nearly five years after payment had been demanded.  The Supreme Court found that the two-year statute of limitations barred the prosecution, rejecting the government's argument that the wrongful conversion continued for each day the attorney held the money and that the prosecution was timely because the defendant had continued to withhold the funds until the date of the indictment.  *Id.* at 451-52. The Supreme Court held that the crime was committed when the defendant had a duty of payment and there also was "such unreasonable delay…[or] some refusal to pay on demand…as would constitute an unlawful withholding in the meaning of the law."  *Id.*

The Supreme Court recognized further that, once that "criminal act of withholding" exists, it "renders the party liable to indictment."  *U.S. v. Irvine*, 98 U.S. at 452.  Moreover, "[t]here is in this but one offense…and from that time…the Statute of Limitations applicable to

-11-

the offense begins to run." *Id.* Finally, the Supreme Court concluded that "[w]henever the act or series of acts necessary to constitute the criminal withholding of the money have transpired, the crime is complete, and from that day the Statute of Limitations beings to run against the prosecution." *Id.* at 452-53; *see also Sunia,* 643 F. Supp. 2d at 75 ("The unlawful conversion of property, whether it be through fraud or some other means, is…'completed as soon as there has been an actual taking of the property.'") (citing *U.S. v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987)).

Here, the SSI explicitly alleges that the funds in both referee accounts were lawfully in Sampson's possession for the limited purpose of transferring them to the court, and that that the embezzlements alleged in Counts 1 and 2 occurred in 1998 and 2002, respectively, well outside the five-year statute of limitations.   As to the Forbell Street Property, the SSI alleges that Sampson was "required by law to…promptly deposit with the Kings County Clerk any surplus funds."  SSI ¶ 18.  More precisely, Sampson was directed by a court order and required by New York law to deposit the surplus "within five days."  Akerman Decl. Ex. A; RPAPL § 1354(4). The SSI alleges that Sampson "never deposited any of the Forbell Street Surplus with the Kings County Clerk," but rather embezzled it in "July 1998," evidently based on the fact that the sale of the Forbell Street Property occurred in July 1998.  SSI ¶ 20.  As addressed above, this reference to July 1998 is in error because Sampson's obligation to deposit surplus funds with the court was not triggered on the sale date, but on the date when he received the full sale proceeds, which was by October 7, 1998.  Akerman Decl. Ex. C.  Thus, the surplus had to be deposited with the court by October 12, 1998, and the crime of embezzlement was completed no later than October 13, 1998.

As to the Eighth Avenue Property, the SSI alleges that Sampson was "required by law

-12-

to…promptly deposit with the Kings County Clerk any surplus funds." SSI ¶ 21.  Indeed, a court order directed that the surplus be deposited with the clerk "w/I [sic] 5 days after the same shall be received and be ascertainable," consistent with the RPAPL.  Akerman Decl. Ex. E.  The SSI alleges that Sampson "did not deposit the Eighth Avenue Surplus with the Kings County Clerk" but "[i]nstead, starting in approximately 2002, [] began to embezzle funds from the Eighth Avenue Referee Account."  SSI ¶ 23.  More specifically, a deed shows that the sale proceeds had been received by June 28, 2002.  Akerman Decl. Ex. F.  Therefore, the surplus had to be deposited with the court by July 3, 2002 and the alleged embezzlement was completed by July 4, 2002.

In sum, it was no later than October 13, 1998 and July 4, 2002 – when Sampson allegedly violated court orders and a statute by not transferring funds to the court – that his holding the funds was "without authority" of "the rightful owner."  18 U.S.C. § 666(a)(1)(A).  These were precisely the points when Sampson allegedly had "taken another person's property…knowing that the other person would not have wanted that to be done," and the crime was completed. *Silverman*, 430 F.2d at 126-27.  As the Supreme Court held in *Toussie*, "'(s)tatutes of limitations normally begin to run when the crime is complete.'"  397 U.S. at 115 (citations omitted). Nonetheless, Counts 1 and 2 were not indicted until 2013, years after the five-year limitations period ran, requiring dismissal.

Indeed, dismissal is warranted on the same theory enunciated in *Toussie*, where the Supreme Court dismissed a charge for failing to register for the draft based on the statute of limitations.  The defendant there "was required to register sometime between June 23 and June 28, 1959," *i.e.,* within five days of his 18th birthday, but "did not do so during that period or at any time thereafter."  397 U.S. at 113.  The government failed to indict Toussie, however, until

-13-

1967, approximately eight years later.  It argued that the prosecution was timely because, even though the "crime was complete in 1959…it continued to be committed each day that Toussie did not register," until he was 26.  *Id.* at 114.  The Court, applying 18 U.S.C. § 3282, held that the obligation for Toussie to register for the draft "arose when he turned 18" and that "[h]e was allowed a five-day period in which to fulfill the duty, but when he did not do so he then and there committed the crime of failing to register," which was a "single offense."  *Id.* at 119.

Here, Sampson had five days after receipt to transfer surplus funds to the court, just as Toussie had five days to register for the draft.  Like *Toussie*, Sampson was subject to an obligation established by statute.  Unlike *Toussie,* Sampson also was subject to an obligation imposed by court orders.  Just as Toussie's crime was complete as soon as he failed to register within five days, the alleged embezzlement here was complete as soon as funds were not paid to the court within five days.  And, just as the statute of limitations in *Toussie* began to run on the sixth day, the statute of limitations here began to run on the sixth day.  Therefore, as in *Toussie*, the government's failure to indict within five years of the crimes' completion bars prosecution.

There can be no doubt that the allegedly wilful violation of a New York State statute and court orders requiring the surplus be deposited with the court constituted embezzlement, as the SSI alleges.  *See e.g.,* SSI ¶ 20 (Sampson "embezzled" the Forbell Street Property surplus in "July 1998"); *id.* ¶ 23 (Sampson "embezzle[d]" the Eighth Avenue Property surplus in 2002).  However, even if the wilful failure to deposit the surpluses within five days was not embezzlement, subsequent conduct outside the statute of limitations certainly constituted embezzlement of both accounts.  Such alleged conduct included Sampson's wilful failure to transfer the surpluses to the clerk at any time before 2008, when the government contends the statute of limitations began to run, and, as detailed below, the withdrawal of monies from the

-14-

Eighth Avenue Property account before and in July 2006 and from the Forbell Street Property account throughout 2007.

As to the Eighth Avenue Property, the SSI alleges that initially "there were surplus funds of approximately $80,000" (SSI ¶ 22), but that, by "July 21, 2006, a balance of $55,167.94 remained in the Eighth Avenue Referee Account" due to Sampson's "embezzlement," meaning that Sampson had withdrawn approximately $25,000 prior to July 2006.  *Id.* ¶ 24.[4]  The SSI alleges further that in July 2006 Sampson used the $55,167.94 "to purchase a bank check" that was never deposited with the court.  *Id.* ¶¶ 24-25.  Thus, the SSI alleges that Sampson emptied the Eighth Avenue Property account entirely in 2006 after having made earlier withdrawals.

As to the Forbell Street Property, the SSI broadly alleges that "between July 1998 and June 2008, SAMPSON embezzled approximately $80,000 of the Forbell Street Surplus through cash withdrawals and electronic transfers…."  SSI ¶ 20.  In this vein, bank records produced by the government show that, on July 3, 2007, Sampson withdrew $9,000 from the Forbell Street account.[5]  Akerman Decl. Ex. D.  Thus, it is clear that, at the absolute latest, the Eighth Avenue Property account was embezzled by 2006 and the Forbell Street Property account was embezzled by 2007.  *See e.g.*, *U.S. v. Stockton*, 788 F.2d at 217.

### 3.    The SSI's Allegations Regarding Post-Embezzlement Activity Do Not Render this Prosecution Timely

The government cannot avoid dismissal with allegations about stray transactions in 2008 that, if anything, constituted transactions with funds from accounts that had been embezzled outside the limitations period.  Specifically, the SSI alleges that "on or about February 13, 2008,

---

[4] That the government cannot specify when the $25,000 was supposedly withdrawn, due to the non-availability of bank records, underscores the staleness of these charges.

[5] Between July 3, 2007 and January 9, 2008, Sampson made thirteen withdrawals from the Forbell Street Property account, removing most of the proceeds.  Akerman Decl. Ex. D.  These withdrawals occurred outside the limitations period.

SAMPSON transferred $8,000 from the Forbell Street Referee Account into SAMPSON's personal bank account." SSI ¶ 20; *see also id.* ¶ 54.  It further alleges that in June 2008 Sampson exchanged one bank check that had been secured with all the proceeds in the Eighth Avenue Property account in 2006 for a series of additional bank checks.  *Id.* ¶¶ 25-26, 56.

It is black letter law that, once an embezzlement is complete, the use of embezzled proceeds is not a separate crime.  *See Irvine*, 98 U.S. at 452 (as to attorney's wrongfully withholding funds following demand for payment, "[t]here is in this but one offense…and from that time…the Statute of Limitations applicable to the offense begins to run.")  In *U.S. v. McCarthy,* 271 F.3d 387 (2d Cir. 2001), *abrogated on other grounds by Eberhart v. U.S.,* 546 U.S. 12 (2005), the defendant, a former CEO, had overseen the transfer of funds from his company's pension funds to an account he controlled.  After transfer, those funds were used to satisfy a mortgage held by a lender to the company.  *Id.* at 391-93.  Subsequently, the defendant was convicted of embezzlement, money laundering, and other charges in relation to this conduct.  On appeal, the defendant argued there had been insufficient evidence to support money laundering charges because he had made no payments with criminally derived proceeds.  The government countered that the embezzlement had occurred when the defendant moved funds from the pension accounts into accounts he controlled and that money laundering occurred when the defendant used funds from the underlying embezzlement to pay expenses.  *Id.* at 394.

The Second Circuit held that the embezzlement "was complete when [the defendant] transferred the plan funds from the [] trust accounts into accounts under [the defendant's] control."  *U.S. v. McCarthy,* 271 F.3d at 395.  Explaining this point, the Second Circuit held that, "even if [the defendant's] actions stopped after he transferred the Plans' trust account funds to accounts under his control, he would have completed the crime of embezzlement."  *Id.*  Thus,

-16-

while the use of "embezzled funds to pay corporate expenses" constituted money laundering, such transactions had no bearing on the commission of the embezzlement.  *Id.; see also N.Y. v. Antilla,* 77 N.Y.2d 853, 855 (1991) (New York Court of Appeals holds defendant committed larceny by opening joint account with funds of great aunt on false pretenses, not by making later withdrawals from account); *Steinberg v. Zebrasky,* No. 10 Civ. 4372 (RJS), 2011 WL 2565498, at *5 (S.D.N.Y. June 14, 2011) ("Although New York law recognizes the possibility of multiple conversions…the law is quite clear that there can be no 'new' conversion where there has been an unbroken chain of ownership and possession by the defendant.").

In *U.S. v. Hearn*, Criminal No. H-10-500, 2011 WL 1068021, at *1 (S.D. Tex. Mar. 21, 2011), the defendant had worked in Iraq for the State Department.  There, he wrongfully arranged for U.S. government trailers to be leased to a private company, with the lease proceeds being sent to a bank account in the Southern District of Texas that he controlled.  Prosecutors indicted the defendant in that district for converting government property pursuant to 18 U.S.C. § 654, and the defendant moved to dismiss for improper venue, arguing, among other things, that his offense had been committed in Iraq.  The government contended that the wiring of funds to the account in the district continued the conversion such that the offense did not take place entirely within Iraq.  *Id.*

The court disagreed, holding that "[c]onversion is complete the moment the defendant takes, detains or disposes of the goods – depriving the owner of his authority."  *Id.* at *2 (citing *Prosser and Keaton on Torts* 5th ed. 1984).  Thus, conversion "does not continue everywhere that the defendant may have transported the good or sent the money that he may have received by hiring it to others."  *Id*.  The court explained:

> Under the government's theory, if a man took someone else's computer in a
> restaurant in Virginia, pawned it in North Carolina, and deposited the money from

-17-

the pawn into his account in a Texas bank, part [sic] the conversion would have also occurred in Texas. This logic is empty. The attack on the owner's title occurred and was complete the moment the man knowingly took the computer of another in Virginia. Likewise, if Hearn converted the trailers, he did it solely in Iraq. No part of the crime could have occurred in the Southern District of Texas regardless of where the payments may have been wired, the trailers used, or anything else after the exercise of 'adverse dominion.'

*Id.* at *3 (citations omitted); *see also U.S. v. Beard*, 713 F. Supp. 285, 291 (S.D. Ind. 1989) ("what the converter intends to do (or in fact does) with the converted property is irrelevant: the act of 'conversion' is completed upon the initial interference with the owner's interest.")

Here, as the SSI alleges, the embezzlements of the accounts took place in 1998 and 2002, when the surplus funds were not transferred to the court, but instead purportedly remained in accounts over which Sampson had sole authority. Indeed, "even if [Sampson's alleged actions] stopped after" he wrongfully held the funds in an "account[] under his control, he would have completed the crime of embezzlement." *McCarthy,* 271 F.3d at 395. And any subsequent transactions with such funds would not constitute separate acts of embezzlement. *See id.*; *Hearn*, 2011 WL 1068021, at *2 ("No part of the crime could have occurred…after the exercise of 'adverse dominion.'") Thus, none of the 2008 transactions constituted a separate crime for which a prosecution would be timely.

Moreover, as described above, even if the failure to transfer funds to the court within five days was not sufficient to constitute embezzlement (contrary to the SSI's allegations), then the failure to transfer funds within the following weeks, months and years surely was. Furthermore, Sampson allegedly withdrew funds from the Eighth Avenue Account in 2006 or earlier, and from the Forbell Street Account in 2007, underscoring that the alleged embezzlements took place outside the statute of limitations.

-18-

**B.     COUNTS 1 AND 2 SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

Subject matter jurisdiction exists pursuant to 18 U.S.C. § 666 only if the defendant was an agent of an entity that received $10,000 in federal benefits in a one-year period during which the alleged offense was committed.  18 U.S.C. § 666(a)(1)-(A) ("whoever…being an agent" of, *inter alia,* a government or government agency "embezzles"); 18 U.S.C. § 666(b) (principal must receive at least $10,000 in federal benefits in "any one year period"); *see U.S. v. Jackson,* 313 F.3d 231, 234 (5th Cir. 2002) (issue is whether government proved "that the entity of which [the defendant] was an agent received over $10,000 per year of federal funds."); *U.S. v. Harris,* No. 5:07crl-DCB-LCA, 2007 WL 2028948, at *1 (S.D. Miss. July 11, 2007) (government must prove "entity for which the defendant is an agent received more than $10,000 under a federal assistance program in any one year").  To qualify as an agent, the defendant must be "authorized to act on behalf" of a principal.  18 U.S.C. § 666(d)(1).[6]

The First Superseding Indictment failed to allege that Sampson was an agent of an entity that received the requisite federal funds.  Specifically, the First Superseding Indictment alleged that Kings County Supreme Court justices appointed Sampson as referee for the relevant properties (First Superseding Indictment ¶¶ 18, 21); that Sampson acted "on behalf of the Kings County Supreme Court" (*id.* ¶ 4); and that Sampson "owed a fiduciary duty to the Kings County Supreme Court."  *Id.* ¶ 12.  In sum, the First Superseding Indictment alleged that Sampson was an agent of the Kings County Supreme Court.[7]  However, the First Superseding Indictment failed to allege that the Kings County Supreme Court received the requisite federal funds – likely because documents produced by the government in discovery revealed it had not – and alleged

---

[6] Issues relating to subject matter jurisdiction are, of course, properly decided by the Court at this stage.  *See U.S. v. Dransfield,* 913 F. Supp. 702, 707 (E.D.N.Y. 1996).
[7] The Initial Indictment was identical to the First Superseding Indictment in these respects.

only that the "New York State Unified Court System" received the requisite funds.  *Id.* ¶ 13.

Recognizing that the First Superseding Indictment failed to establish subject matter jurisdiction, the government secured the SSI, which magically replaces most of the First Superseding Indictment's references to the Kings County Supreme Court with references to "the Supreme Court of the State of New York."  Specifically, the SSI alleges that justices of the Supreme Court of the State of New York appointed Sampson as referee (SSI ¶¶ 18, 21); that Sampson acted on behalf of "the Supreme Court of the State of New York" (*id.* ¶ 4); and that Sampson "owed a fiduciary duty to the Supreme Court [of the State of New York]."  *Id.* ¶ 12. The SSI also contends that the Supreme Court of the State of New York received the requisite federal funds.  *Id.* ¶ 13.

The government's facile attempt to rewrite history through the SSI is unavailing. Indisputably, judges of the Kings County Supreme Court issued the orders creating Sampson's agency.  These orders directed Sampson to act in matters before the Kings County Supreme Court relating to two specific properties in Brooklyn.  The orders granted Sampson no further authority.  Akerman Decl. Exs. A and E.  Thus, Sampson was an agent of the Kings County Supreme Court, as the government itself had contended until last month.

Critically, nothing authorized Sampson to act on behalf of an entity known as the "Supreme Court of the State of New York" or on behalf of a Supreme Court in any county other than Kings County.[8]  *See, e.g., U.S. v. Langston*, 590 F.3d 1226, 1229, 1233-35 (11th Cir. 2010) (reversing 18 U.S.C. § 666 conviction because, while defendant was an agent of the Fire College, an Alabama state agency, he was not an agent of the State of Alabama, given that "an employee

---

[8] The SSI alleges that "[u]nder the New York State Constitution, the Supreme Court was a single tribunal of general statewide jurisdiction."  SSI ¶ 12.  Regardless of that formality, it does not appear that any entity denominated as the "Supreme Court of the State of New York" (without reference to a specific county) has an identifiable location or functions for practical purposes.

-20-

of an agency entity cannot be an agent of the principal entity unless the legal construct establishes such a relationship" and defendant's "employment with the Fire College [did] not authorize him to act on behalf of the state under the applicable state law"); *U.S. v. Sunia*, 643 F. Supp. 2d at 57 (vacating 18 U.S.C. § 666 convictions because, while defendants were agents of American Samoan legislature, they could "not be viewed as agents of the American Samoa Departments of Treasury or Education"). Given the fact that Sampson was an agent of the Kings County Supreme Court and the SSI fails to allege that the Kings County Supreme Court received any federal funds, subject matter jurisdiction does not exist.

Moreover, regardless of the entity for which Sampson had been an agent, any agency relationship terminated well before the 2008 embezzlements alleged in Counts 1 and 2. The Forbell Street Property matter (Index No. 040446/1995) concluded in June 1999. Akerman Decl. Ex. G. The Eighth Avenue Property matter (Index No. 033928/2001) concluded in March 2002. *Id.* Ex. H. When those matters were closed, Sampson's agency was terminated; any other result would have Sampson being an agent for life, even in the absence of an active proceeding. Thus, Sampson had long ceased "being an agent" when the crimes alleged in Counts 1 and 2 were committed, precluding the application of 18 U.S.C. § 666. 18 U.S.C. § 666(a)(1).[9]

## C. COUNT 10, PREDICATED UPON THE LIQUOR STORE SCHEME, WAS IMPROPERLY JOINED AND SHOULD BE SEVERED

In Count 10, Sampson is charged with violating 18 U.S.C. § 1001 for allegedly telling FBI agents that "he did not ask any member of his Senate staff" to intercede with state tax

---

[9] While the embezzlement charges should be dismissed, they also are multiplicitous and should not have been asserted as separate counts. *See U.S. v. Urlacher*, 784 F. Supp. 61, 63 (W.D.N.Y. 1992) (finding multiplicitous two counts under 18 U.S.C. § 666 relating to embezzlements in the same year because "the only difference between [them] is the source of money the defendant allegedly embezzled" and the unit of prosecution is "'$5,000 or more,' from whatever source, in any one year period…."), *aff'd U.S. v. Urlacher*, 979 F.2d 935, 937 (2d Cir. 1992) (finding that trial court properly consolidated two counts). Here, the SSI asserts two embezzlement counts, both based on alleged thefts in 2008. However, unlike in *Urlacher*, the source of the allegedly embezzled funds here is the same as to both counts, making the multiplicity analysis even easier than it was in *Urlacher*.

authorities on behalf of the Liquor Store.  SSI ¶ 72.  There is no relationship at all between this charge and Counts 1 through 7.  The only relationship between this charge and Counts 8 and 9 is that Sampson allegedly made the statement relevant to Count 10 during the same conversation in which he allegedly made the statements charged in Counts 8 and 9.  Because the allegation that Sampson lied about the Liquor Store has no substantive relationship to any other charge and because the allegations underlying Count 10 unfairly prejudice Sampson's ability to defend against those other charges, Count 10 should be severed.

### 1.     Two or More Related Offenses May Be Joined for Trial Absent a Danger of Unfair Prejudice

Fed.R.Crim.P. 8(a) governs the joinder of offenses in an indictment:

> The indictment…may charge a defendant in separate counts with 2 or more offenses if the offenses charged…are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

To determine if offenses are based on the same act or transaction, or are part of a common scheme, requires a relatively straightforward factual analysis.  As to whether offenses are "of the same or similar character," the Second Circuit has held joinder is proper only "where evidence of the one offense would be admissible in a separate trial on the other offense as evidence of 'other crimes, wrongs, or acts,'" because in such cases "the defendant is not unfairly prejudiced by the joint trial of the offenses."  *U.S. v. Halper*, 590 F.2d 422, 431 (2d Cir. 1979). Thus, offenses must be severed if they "are purportedly of the 'same or similar character' unless evidence of the joined offenses would be mutually admissible in separate trials or, if not, unless the evidence is sufficiently 'simple and distinct' to mitigate the dangers otherwise created by such a joinder."  *Id.*  "And even where evidence of the joined offenses might be mutually admissible in separate trials," prosecutors and trial courts should "exercise caution with regard to the joinder of 'same or similar character' offenses."  *Id.*

There are several reasons for these rules. First, "[w]hen all that can be said of two separate offenses is that they are of the 'same or similar character,' the customary justifications for joinder (efficiency and economy) largely disappear." *Halper*, 590 F.2d at 430. Second, "the disadvantage to which a defendant is put and the potential danger to which a defendant is exposed by joinder of offenses of 'same or similar character' are easily understood." *Id.* Specifically, "the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or [] the jury may cumulate the evidence of various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one." *Id.* (internal quotations and citations omitted).

The Second Circuit has observed that similar risks of unfair prejudice exist when different crimes are tried together on any basis. *Halper,* 590 F.2d at 430-31 ("There is indeed always a danger…that the jury may use the evidence cumulatively…[a] possibility [that] violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition.") (internal quotations and citations omitted). As such, "even if the offenses could have been joined in a single indictment under Rule 8(a), the trial court is not automatically free to order the indictments tried together under Rule 13 [because] 'literal compliance with the Rule (governing joinder of offenses) is not necessarily final, in cases where there is danger of confusion or of unfair prejudice from the joinder.'"[10] *Id.* at 428 (citations omitted). Thus, pursuant to Fed.R.Crim.P. 14(a), "[i]f the joinder of offenses...or a consolidation for trial appears to prejudice a

---

[10] Fed.R.Crim.P. 13 provides that a court may order separate offenses to be tried together as though brought in a single indictment if all offenses could have been joined in the indictment.

defendant…the court may order separate trials of counts."

> **2.** **The Embezzlement and Obstruction Counts Have No Relation to Sampson's Alleged Statement About the Liquor Store**

The embezzlement charges (Counts 1 and 2) allege conduct by Sampson acting alone in his capacity as referee for foreclosure sales, beginning in 1998 and 2002.  SSI ¶¶ 12-26.  One obstruction charge (Count 3) alleges that Sampson attempted to gain information from a government employee regarding a mortgage fraud prosecution in 2011.  *Id.* ¶¶ 27-32.  The other obstruction charges (Counts 4 through 7) allege that Sampson prevented a document and information from being provided to the government in relation to the "Associate Transaction." *Id.* ¶¶ 33-38.  By contrast, Count 10 concerns an alleged false statement about attempting to reduce taxes owed by the Liquor Store in the context of the Liquor Store Scheme.  *Id.* ¶¶ 39-47.

The government employee and the "Associate" referenced in connection with the obstruction counts are not alleged to have had any role in the Liquor Store Scheme.  Other than Sampson, the SSI does not allege that any of the individuals who purportedly took part in the Liquor Store Scheme had anything to do with the alleged embezzlement or obstruction.  And, the alleged misrepresentation to FBI agents about the Liquor Store is not an offense that led to or depended on the alleged embezzlement or obstruction offenses.

As such, there is no legitimate argument that the embezzlement and obstruction offenses, on the one hand, and Count 10, on the other, are "based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed.R.Crim.P. 8(a); *see Halper*, 590 F.2d at 429 (holding joinder improper where "[c]ommission of one of the offenses neither depended upon nor necessarily led to the commission of the other; proof of the one act neither constituted nor depended upon proof of the other," and concluding that Medicaid fraud indictment and tax evasion indictment were not based on "same act or transaction"); *U.S. v.*

*Stewart*, 433 F.3d 273, 314 (2d Cir. 2006) (joined offenses may be "unified by some substantial identity of facts or participants") (internal quotations omitted); *U.S. v. Shellef*, 507 F.3d 82, 100 (2d. Cir 2007) ("We do not think, then, that the 1999 Tax Count…provides an adequate link between the 1996 Tax Counts and the non-tax counts to justify joinder of all the charges against Shellef.")

Neither are the obstruction and embezzlement counts "of the same or similar character" as Count 10.  In *Kerik*, the court found the government's "broad motif of 'similar kinds of substantially alleged dishonesty'" was insufficient to justify joinder:

> the government [] cobbled together in the Superseding Indictment a laundry list of illegal schemes and false statements made over the span of eight years.  The charges are not related to all others by time, actors, places or subject matter.  The lone common link is [the defendant] himself.

615 F. Supp. 2d at 275 (citations omitted)*; see also U.S. v. Bezmalinovic*, No. S3 96 Cr. 97, 1996 WL 737037, at *3 (S.D.N.Y. Dec. 26, 1996) ("The government's broad argument that in all the offenses charged, Bezmalinovic used fraud to achieve his goal of obtaining money, is true of a great number of crimes, not all of which are of a 'similar character' to each other within the meaning of Rule 8(a)."); *U.S. v. Buchanan*, 930 F. Supp. 657, 662 (D. Mass. 1996) ("The government cannot link cases simply by changing the level of abstraction – namely that this case is about an abuse of trust, rather than about two distinct allegedly illegal schemes.")

Joinder is not proper either under the rubric of "same or similar character," premised on the notion that evidence of Count 10 would be admissible pursuant to Rule 404(b) in a separate trial on Counts 1 through 7 or vice versa.  Evidence of alleged dishonesty in statements to the government about the Liquor Store Scheme (per Count 10) would not be admissible to show motive or intent in the context of charges that Sampson prevented evidence from being provided to the government regarding other matters (per Counts 4-7) or vice versa; nor would it be

-25-

admissible in the context of the embezzlement charges or the charges that Sampson sought information from a government employee (per Counts 1-3).

In this regard, the *Halper* court stated its intent to "stem the tide" by which the exceptions to Rule 404(b) had begun to swallow the rule that evidence of bad acts is not admissible to prove a defendant has acted in conformity therewith. *Halper*, 590 F.2d at 432. The *Halper* court observed further that it "fail[ed] to see…how the alleged submission of a false income tax return is at all relevant to the question of whether [the defendant] knowingly intended to defraud the Medicaid program by allowing his clerical personnel to submit inaccurate laboratory test invoices; nor can we understand how the wealth of evidence purportedly relating to the Medicaid fraud indictment was relevant to the question whether [the defendant] knowingly intended to submit a false personal income tax return." *Id.; see also U.S. v. Sampson,* 385 F.3d 183, 192, n.7 (2d Cir 2004) (Judge Jacobs rejects as "propensity reasoning" use of evidence of drug offenses at trial on different set of drug offenses because "[o]ther-crime evidence may be admitted if the evidence of other crimes is so distinctive that it can be seen as a 'signature' identifying a unique defendant, such as the infamous Jack the Ripper," but "is not permissible to identify a defendant as the perpetrator simply because he or she has at other times committed the same garden variety criminal act") (citations omitted).[11]

### 3. Joinder Should Not Be Permitted Solely Because the Allegedly False Statements Alleged in Counts 8-10 Were Made During a Single Interview

Counts 8 and 9 are based on allegedly false statements made by Sampson to FBI agents – during a surprise visit outside his home – regarding, respectively, a check register page

---

[11] Because Count 10 was not properly joined to Counts 1 through 7 pursuant to Rule 8(a), issues of efficiency are not relevant; however, there would be a complete absence of efficiency here, given the lack of common facts. Indeed, the Second Circuit has held that, "[w]hen all that can be said of two separate offenses is that they are of the 'same or similar character,' the customary justifications for joinder (efficiency and economy) largely disappear." *Halper*, 590 F.2d at 430.

-26-

purportedly created by the "Associate" to reflect 2006 transactions between Sampson and the "Associate," and Sampson's efforts to get information regarding the 2011 mortgage fraud prosecution.  SSI ¶¶ 6, 33, 48-50, 68, 70.  Count 10, again, is based on an allegedly false statement regarding the Liquor Store made during the same interview.  *Id.* ¶¶ 51, 72.  The only commonality among these counts is that all arise from the same FBI interview.  If such a "commonality" were sufficient for Rule 8(a) purposes, the rule would be susceptible to government manipulation and, in effect, become meaningless.  Indeed, the government could always choose to question an individual at one time regarding unrelated matters.  Given that the government must demonstrate materiality to prove a false statement charge (*U.S. v. Diogo*, 320 F.2d 898, 902 (2d Cir. 1963)), the government then would have exceedingly broad power to prove unrelated underlying criminal conduct in any trial involving false statement charges.

Justice Ginsburg addressed analogous concerns relating to the government's use of 18 U.S.C. §1001 in a concurring opinion in *Brogan v. U.S.*, 522 U.S. 398, 408 (1998).[12]  The concurrence was written "to call attention to the extraordinary authority Congress, perhaps unwittingly, has conferred on prosecutors to manufacture crimes."  *Id.*  Justice Ginsburg pointed out that 18 U.S.C. § 1001 "arms Government agents with authority not simply to apprehend lawbreakers, but to generate felonies, crimes of a kind that only a Government officer could prompt."  *Id.* at 409.

By way of example, Justice Ginsburg described the FBI interview of Brogan in which "[t]wo federal investigators paid an unannounced visit" to the defendant's home and asked him questions about a document they "already possessed [] indicating" that the defendant had committed a crime.  *Brogan,* 522 U.S. at 409-10.  As Justice Ginsburg explained, it is problematic that, pursuant to 18 U.S.C. § 1001, a prosecutor can use the "lie as a substitute for

---

[12] *Brogan* held that the "exculpatory no" doctrine is not a defense to 18 U.S.C. § 1001.

the crime [that the prosecutor] cannot prove" or "to revive" a case where "the statute of limitations has run on an offense" "by instructing an investigator to elicit a fresh denial of guilt." *Id.* at 411; *see also U.S. v. Yermian,* 468 U.S. 63, 82 (1984) (Rehnquist, J. dissenting) (18 U.S.C. § 1001 can "make a surprisingly broad range of unremarkable conduct a violation of federal law") (internal quotations omitted); *U.S. v. Moore,* 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J. concurring) (referring to "the ever-metastasizing § 1001").[13]

Here, two FBI agents made an unannounced visit to Sampson's home and asked him about various unrelated subjects, including a document they already possessed. That document related to alleged offenses, *i.e.,* the embezzlements, as to which the statute of limitations had run. *See* SSI ¶¶ 6, 9. Given the concerns expressed by Justice Ginsburg and others as well as the nearly boundless authority the government would have to manufacture joinder if it were permitted to join counts in the circumstances relevant here, Count 10 should be severed.[14]

### 4. Even if Count 10 Had Been Properly Joined, Proof of that Count Will Create Unfair Prejudice

Even if properly joined, Count 10 should be severed because of the real risk of unfair prejudice that will be created by the evidence and arguments the government would offer to the jury. *See* Fed.R.Crim.P. 14(a). "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note; Weinstein's Federal Evidence § 404.21[3][b] (Volume 2 2014) (unfair prejudice refers to "the tendency of certain evidence to provoke an

---

[13] Likely in recognition of concerns such as these, the Solicitor General has stated in recent court filings, as the official position of the U.S. Department of Justice, that the government must prove a defendant knew it was unlawful to make a false statement to establish a violation of 18 U.S.C. § 1001. *See* Brief of the United States in Opposition to Certiorari, *Natale v. United States*, No. 13-744 (March 2014) at 12; Tony Mauro, *U.S. Shifts its View of False-Statement Law,* N.Y.L.J., May 13, 2014.

[14] Notably, there would be no meaningful efficiency in joining Counts 10 with Counts 8 and 9 because the only evidentiary overlap among them is that the alleged statements were made during one interview. It would take a few moments for an agent to provide the necessary background regarding the interview at each of two separate trials.

emotional response in the jury or otherwise to suggest a decision on an improper basis."); *see also Gordy Co. v. Mary Jane Girls, Inc.,* Nos. 86 CIV. 6814 (RWS), 1989 WL 28477 at *6 (S.D.N.Y. Mar. 24, 1989).

The SSI demonstrates that the government will seek to offer evidence regarding a range of alleged official misconduct in connection with Count 10.  Specifically, the SSI alleges that, as a Senator, Sampson was required to disclose any ownership interest he had in a business, but that he concealed his interest in the Liquor Store.  SSI ¶¶ 1, 10.  Similarly, the SSI alleges that Sampson "hid his ownership interest…from his Senate staff members, including a staff member [he] directed to intervene with a New York State agency on behalf of the Liquor Store." *Id.* ¶ 10. In that connection, the government will argue to the jury that Sampson "repeatedly directed a member of his Senate staff…to intervene with the [tax authorities] on behalf of the Liquor Store in order to resolve the Liquor Store's outstanding sales tax obligations, including by attempting to reduce the amount the Liquor Store owed." *Id.* ¶ 44; *see also id.* ¶ 46.  The government will further argue that, "[a]lthough SAMPSON never contributed any capital investment, he received an ownership interest in the Liquor Store," suggesting some manner of impropriety. *Id.* ¶ 41.  In sum, the government fully intends to argue that Sampson abused his elected office.

Any doubts about whether the government intends to make this a "political" case would be dispelled by the government's leaks[15] and official public statements.  The Initial Indictment contained not a single charge arising out of Sampson's conduct as a Senator.  Nonetheless,

---

[15] The day before the arraignment on the Initial Indictment, *The New York Times* reported that, according to "law enforcement officials," Sampson was to be charged in connection with a "public corruption inquiry."  Akerman Decl. Ex. K.  The article also referenced a document filed on May 3 in the prosecution of former State Senator Shirley Huntley; that letter spoke of a "New York State Senator" who had "suggested to [Huntley] that she use her official influence on behalf of [a] Businessman...in exchange for payment…." *Id.* Ex. L.  *The New York Times* reported that "a person with knowledge of the case" had said that Sampson was the unnamed "senator." *See also* Akerman Decl. Ex. M (John Marzulli and Greg B. Smith, *Prosecutors reveal 8 people secretly taped by state senator are under criminal investigation*, N.Y. DAILY NEWS, May 8, 2013) (referring to "sources" who described confidential plea negotiations between government and Sampson, and to letter in Huntley case as effort "to increase pressure on Sampson by releasing a document that appeared to implicate him in political corruption.")

during a press conference to announce the Initial Indictment's unsealing, the United States Attorney Loretta Lynch described Sampson's alleged conduct as "one of the most extreme examples of political hubris that we have yet seen."  Akerman Decl. Ex. I.  She stated further that "his oath as a state senator; his position on either the Judiciary or Senate Ethics Committee in no way impacts how he does business."  *Id.* Ex. J.  FBI Assistant Director-in-Charge George Venizelos said, "[t]oday we add one more name to the ever-lengthening list of corrupt New York officials."  *Id.* Ex. I.  He also referred to "elected officials who have been treating encumbered [sic] seats like the keys to the treasury."  *Id.* Ex. J.[16]

The allegations underlying Count 10 and the arguments the government intends to advance based on these allegations create an unacceptable risk of unfair prejudice as to the other counts.  Notably, a large percentage of the public is profoundly cynical about New York's elected officials and actually expects such officials to abuse their offices criminally.  *See Head-to-Head, Cuomo Leads Astorino by 30 Points; But By Only 15 Points in 3-Way Race with Liberal WFP Candidate*, Siena Research Institute, April 22, 2014 (84% of voters believe corruption in Albany is serious problem); *Moreland & Its Work Largely Unknown to Voters, Who Strongly Want Commission to Continue Investigations*, Siena Research Institute, October 21, 2013 (more than 80% of voters think corruption in legislature is serious problem); *81% of Voters Say More Arrests of Legislators for Corruption Are Likely*, Siena Research Institute, April 22, 2013 (more than 80% of voters believe there will be additional arrests of lawmakers for corruption and many believe their representatives could be arrested; 91% of voters think legislative corruption is serious problem); Thomas Kaplan, *In Poll, Most New Yorkers Say*

---

[16] A press release from that day quoted United States Attorney Lynch as saying, "[t]he Voters of New York State rightfully expect their elected officials to represent the voters' interests, not to trade on their positions of power to line their own pockets."  Assistant Director-in-Charge Venizelos was quoted as saying, "we share what may well be the concern of many New Yorkers that 'incumbent' and 'defendant' cannot be accepted as interchangeable." Akerman Decl. Ex. N.

*Corruption Is a Big Problem,* N.Y. TIMES, April 17, 2013 (Quinnipiac University poll finds 90% of New York voters see government corruption as serious problem).[17]

For all these reasons, the government should not be permitted to try Count 10, by which the government will attempt to portray Sampson as having abused his elected office, with Counts 1 through 9, which have no relation to Sampson's elected office.  Unlike many cases in which the specter of unfair prejudice is raised, there is nothing speculative about the government's intended tack or the public attitudes at issue here.  *Cf. U.S. v. Lekhtman,* No. 08-CR-508 (DLI), 2009 WL 5095379, at *7-8 (E.D.N.Y. Dec. 15, 2009) (rejecting claims of prejudice as "speculative").  In fact, United States Attorney Lynch underscored this dynamic at the referenced press conference when, after describing Sampson's alleged conduct as "extreme…political hubris," she observed that "the saddest part of all of this is that it tends to taint the entire legislative body…it causes people to become more cynical."  Akerman Decl. Ex. I.

This unfair prejudice is further compounded by the government's intent to prove that Sampson committed a New York State felony by "[k]nowingly submitting a license application to the SLA that contains false statements or information."  SSI ¶ 39.  Obviously, the United States Attorney's Office could not charge Sampson with this purported crime.  Nonetheless, the prejudice that the Second Circuit has found exists when multiple charges are tried together would exist here if the government were to attempt to prove this uncharged crime.  *See, e.g., Halper*, 590 F.2d at 430 ("A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.") (internal quotations and citations omitted).

Given the context addressed above, this may be a case in which "[t]he ineluctable conclusion is that the government added [a] count solely to buttress its case on the other counts."

---

[17] The polls and article referenced in this paragraph are appended to the Akerman Decl. as Exhibits O through R.

*U.S. v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994) (no new facts supported belated addition of charge, which would not have resulted in longer sentence upon conviction because of grouping rules).  The government could have included Count 10 in the Initial Indictment, given that the alleged false statement was made in July 2012 and the Initial Indictment issued in April 2013. *See* SSI ¶ 72.  Moreover, as counsel for the government stated at the arraignment on the First Superseding Indictment, the government had already produced all discovery relating to Count 10 with the discovery for Counts 1 through 9.[18]

Finally, this is not a case in which jury instructions can reasonably be expected to prevent unfair prejudice, given the powerful impact that evidence and arguments regarding the purported abuse of an elected office would inevitably have on jurors.  *See, e.g., Jones*, 16 F.3d at 492 (it would be "quixotic to expect the jurors to perform [the] mental acrobatics called for by [the limiting instruction]").

## CONCLUSION

For the reasons set forth above, Counts 1 and 2 of the SSI should be dismissed and Count 10 should be severed.

Respectfully submitted,

/s/Nathaniel Akerman
Nathaniel Akerman, Esq.
Joshua Colangelo-Bryan, Esq.
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
(212) 415-9200

*Attorneys for Defendant
John Sampson*

4838-3138-8443

---

[18] The government did subsequently produce an FBI 302 with arguable, if attenuated, relevance to Count 10, but that document had been created before the Initial Indictment issued.